2020 IL App (1st) 171001

No. 1-17-1001

Opinion filed September 29, 2020.

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 CR 2831 |
| | ) | |
| FRANCISCO CARRION, | ) | The Honorable |
| | ) | James N. Karahalios, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendant Francisco Carrion appeals from the circuit court's order denying him leave to file a successive petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 (West 2016)). On appeal, he contends his *pro se* petition stated a meritorious claim that his sentence is unconstitutional under *Miller v. Alabama*, 567 U.S. 460 (2012), which held that mandatory life without parole for juveniles under 18 at the time of their crimes violates the eighth amendment's prohibition against cruel and unusual punishments. Defendant, while also asserting an Illinois

proportionate penalties violation, argues that *Miller* and its progeny should apply to him even though he was age 19 at the time he committed the residential burglary and murder in this case. He maintains the trial court failed to consider the circumstances surrounding his youth when imposing his sentence. We affirm.

¶ 2                                    BACKGROUND

¶ 3                                  Trial Evidence

¶ 4     Following a bench trial, defendant was found guilty of committing residential burglary in the home of 69-year-old Maryanne Zymali and then murdering her. Briefly stated, trial evidence showed that on the evening of July 13, 2001, defendant drank numerous beers with friends and then went to a bar, where he drank more beers to the point where he had trouble walking and he was drunk, dancing by himself and talking to himself. Around 2 a.m., he left the bar on foot. As defendant approached his building complex, he noticed a light on in Zymali's apartment (which was in the same building), and he found the sliding glass door ajar. He opened the screen door and entered because he was aiming to steal something. Zymali confronted defendant in the kitchen with a knife, a struggle ensued, and defendant grabbed another knife from the drawer but then dropped it. Meanwhile Zymali still had her knife, and the struggle continued with defendant eventually gaining control of it and stabbing her in the stomach. Defendant pulled the knife out, threw it, and ran out of the apartment. He scaled the two-story building to his second-floor apartment, where he fell asleep. Defendant had no injuries.

¶ 5     Police later found Zymali lying on the kitchen floor bleeding from her jaw and abdomen. There was blood on the floor, kitchen countertop, cabinets, walls, and phone, as well around the phone stand. Two knives were recovered, one from the dining room and another with a bent blade and blood on it from the living room. The medical examiner found stab wounds to

Zymali's jaw, lower chest, and forearm and bruising/abrasions to her thigh, forehead, chin, chest, arm, and abdomen. The stab wound to her chest area caused massive internal hemorrhaging, and Zymali died from multiple stab wounds. Although defendant initially denied involvement in the murder, police were able to match defendant's finger and palm prints to the knife at the crime scene, and defendant later confessed in a videotaped statement that was ultimately published at trial. The Spanish-speaking officer who had arrested defendant served as the translator for the videotaped confession. None of the trial exhibits, including the videotape and its transcription, have been included in the record on appeal.

¶ 6    In his defense at trial, defendant testified through an interpreter that he did not intend to take anything, he was very drunk, and he was attempting to defend himself against the five-foot, two-inch Zymali. The trial court found that theory of defense incredible given the evidence, including the exhibits introduced at trial. The court concluded there was no evidence of a great struggle that would have justified defendant using deadly force against Zymali. Accordingly, the trial court found defendant guilty of burglary and murder.

¶ 7                                 Sentencing

¶ 8    At the sentencing hearing, the trial court first found defendant legally eligible for the death penalty or anywhere from 20 years to natural life in prison without parole. The court considered the presentence investigation report (PSI). The PSI noted defendant's birthdate, February 27, 1982, making him 19 years old at the time of the crime without any prior criminal history. Defendant, originally born in Mexico, had moved to the United States several months prior to his arrest in order to make additional money to send to Mexico for his mother. Defendant's alcoholic father, with whom he had not had contact since age five, physically abused defendant's mother and sexually abused both him and his two sisters.

¶ 9    Defendant was never married and had no children. He had the equivalent of a sixth-grade education and worked as a landscaper in the United States and busboy in Mexico. He was in good physical health with no history of psychological hospitalization or treatment. Defendant, who first experimented with alcohol and marijuana at age 17, admittedly abused alcohol and had an alcohol problem. He stated that he drank beer "too much" and "loses his mind." Defendant denied any gang affiliations and stated he attended Bible study while incarcerated.

¶ 10    Prior to the court's ultimate ruling, in aggravation, the State presented the victim impact statements of Zymali's family members, including from her sister-in-law, brother, son, and daughter. These statements were read into the record and marked as exhibits as "part and parcel" of the PSI. The State also introduced an audio recording of the 911 call Zymali made after the stabbing, which according to the State depicted her as begging for help, identifying her injuries, and "all but [dying] on that phone call." The 911 tape is not part of the record on appeal.

¶ 11    The record reflects that, in mitigation, the defense presented an advocacy report (which also is not part of the record on appeal) containing witness summaries that were accounts of defendant's life, and it included those by his sister and stepfather, but the defense noted there were no live witnesses. The defense then emphasized several times that defendant was only age 19 at the time of the offense, "a tender age," without any prior criminal history. The defense further noted defendant grew up in severe poverty and suffered extreme physical and sexual abuse by his father, which was "nightmarish." The defense highlighted defendant's sixth-grade education and abandonment by his parents, even while he remained gainfully employed in Mexico and the United States. In addition, the defense argued defendant expressed remorse in his videotaped statement since he was crying in it. The defense added that defendant had been in custody three years without incident and participated in a Christian program while incarcerated.

¶ 12    In aggravation, the State argued that defendant could have chosen to flee the scene after entering Zymali's home and even after wrestling with Zymali, but he instead chose to murder her. The State highlighted that it was a senseless murder, where defendant showed a lack of remorse since he chose to go home and fall asleep rather than help the victim, and he then denied involvement to the police several times. The State argued defendant was only sorry after his DNA linked him to the crime and he was caught. The State also urged the court to consider that defendant had lied on the stand when describing the events that unfolded immediately preceding the murder and noted this was indicative of his poor character and poor prospect for rehabilitation given that he yet again avoided responsibility for the murder he committed. The State asked that the court consider the pain and suffering of the victim in her last moments and also the victim impact statements. The State argued death was an appropriate sentence.

¶ 13    The court asked defendant if he wished to say anything in allocution, to which defendant responded, "No. Forgiveness."

¶ 14    Prior to imposing the sentence, the court noted it was difficult to hear the 911 tape of the victim's dying words and "Judges are human but I still can separate it." The court emphasized that "judges cannot sentence in anger" but must consider the law and "have mercy on those that commit the absolute wors[t] wrongs***." In considering the death penalty and evidence in aggravation, the court noted that the murder was committed in the course of a felony, the defendant was in the United States illegally, and he had lied. The court noted that lying was nonetheless a standard practice by most defendants and not necessarily a reason to impose the death penalty.

¶ 15    Turning to the mitigation, the court observed that there was little in the way of mitigation and found defendant was not contrite, stating:

"It would have been nice for the Court to see this defendant turn to the family of his murdered victim and say he was sorry. Not that sorry would have been good enough but it would have been a start. But I don't think he's much of a man at all. I think he's a coward and he sits there in front of his family who is here and his family knows he's a coward."

The court noted defendant's physical and sexual abuse and stated, "I do take that seriously as part of the mitigating [evidence]." As to his lack of a criminal background, the court observed that defendant had only been in the United States a short period illegally, and defendant's criminal background in Mexico was unknown but "there's no evidence of criminal activity that this Court can hang its hat on nor are there any arrests." The court noted defendant's gainful employment as well. Based on all the factors, the court found that while defendant did not deserve a death sentence, he did deserve a "harsh sentence" with his "attitude," which the court wished the record to reflect. Finally, the court stated:

"I've reviewed all the matters in mitigation and the mitigation report prepared by the sentencing advocate ***. I find that the mitigation report is in fact complete, it's thorough and it's exhaustive ***. I've read and reread the letters, the victim impact statements prepared. I've read the presentence investigation report again. I read it several times. I considered each and every matter in that report[,] particularly the defendant's age, his lack of education, his family history, combined with the advocacy mitigation report. I've also considered those statutory matters of aggravation and mitigation as it is my duty and obligation to do so."

¶ 16     Following this, the court sentenced defendant to 55 years in prison for murder, to be served with a 15-year concurrent term for residential burglary. The court declared that defendant

"should serve every single day, [and] not one day off for good behavior." The court concluded that "[i]f it was up to me I'd give him a tape recorder and a cassette tape of the 911 so he could listen to it and put him to sleep at night every single night."

¶ 17                                     Direct Appeal

¶ 18    Defendant filed a direct appeal wherein he argued the evidence was insufficient to find him guilty and that, at sentencing, the trial court was biased against him and considered improper evidence. This court granted the State Appellate Defender's motion for leave to withdraw under *Anders v. California*, 386 U.S. 738 (1967), finding there were no issues of arguable merit, and thus affirmed the judgment of the circuit court. *People v. Carrion*, No. 1-04-3785 (2006) (unpublished order under Illinois Supreme Court Rule 23).

¶ 19                              Postconviction Petitions

¶ 20    Defendant then filed an unsuccessful *pro se* postconviction petition, again arguing *inter alia* that the trial court was biased at sentencing due to his choice of words. Defendant appealed. This court granted the State Appellate Defender's motion for leave to withdraw under *Pennsylvania v. Finley*, 481 U.S. 551 (1987), finding there were no issues of arguable merit, and thus affirmed the judgment of the circuit court. *People v. Carrion*, No. 1-11-0601 (2012) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 21    On March 23, 2017, defendant filed the present successive *pro se* postconviction petition, wherein he alleged that his 55-year sentence was a *de facto* life term and unconstitutional as applied under *Miller* because it violated the eighth amendment's prohibition against cruel and unusual punishments and also the Illinois Constitution's proportionate penalties clause. Defendant also cited *People v. House*, 2015 IL App (1st) 110580, in support. He argued that the court at sentencing denied him the opportunity to present mitigating evidence and his sentence

did not reflect his potential for rehabilitation or his age and age-related characteristics. In so arguing, defendant asserted the court "ignored" the *Miller* factors, specifically related to defendant's youth, history of family abuse, poor education, steady employment, and lack of criminal history. He maintained that the court instead focused only on the elements of his crime. Defendant asked that the circuit court grant his petition and order a new sentence of 20 years consistent with the above-cited case law. In support of his petition, defendant attached a portion of the transcript from his sentencing hearing.

¶ 22    The circuit court denied leave to file the successive petition. This appeal followed.

¶ 23                                    ANALYSIS

¶ 24    On appeal, defendant argues that his sentence is unconstitutional as applied to him under the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. Defendant asserts that the circuit court therefore erred in denying him leave to file a successive postconviction petition. The Act provides a procedural mechanism through which a criminal defendant can assert that his federal or state constitutional rights were substantially violated in his original trial or sentencing hearing. 725 ILCS 5/122-1(a) (West 2016); *People v. Davis*, 2014 IL 115595, ¶ 13. The Act contemplates the filing of only one petition without leave of court, and any claim not presented in an original or amended petition is waived. *Davis*, 2014 IL 115595, ¶¶ 13, 14. As a result, successive postconviction petitions are highly disfavored, and the statutory bar will be relaxed only when fundamental fairness requires it. *People v. Bailey*, 2017 IL 121450, ¶ 39; *People v. Holman*, 2017 IL 120655, ¶ 25.

¶ 25    Leave of court for initiating a successive postconviction petition is granted only when a defendant shows cause for his failure to bring the claim in his initial postconviction petition and prejudice resulting from that failure. 725 ILCS 5/122-1(f) (West 2016); *People v. Evans*, 2013 IL

113471, ¶ 10. To show cause, a defendant must identify an objective factor that impeded his ability to raise a specific claim during his initial postconviction proceedings. *Evans*, 2013 IL 113471, ¶ 10. To show prejudice, a defendant must demonstrate that the claim not raised during initial postconviction proceedings so infected the trial that the resulting conviction or sentence violated due process. *Id.* It is the defendant's burden to establish a *prima facie* showing of cause and prejudice in order to be granted leave before further proceedings on his claims can follow (*Bailey*, 2017 IL 121450, ¶ 24; *People v. Smith*, 2014 IL 115946, ¶ 30), and both elements must be satisfied for the defendant to prevail (*Davis*, 2014 IL 115595, ¶ 14). For the reasons to follow, defendant cannot establish prejudice since his claims are not legally cognizable.

¶ 26 As set forth, *Miller* held that mandatory life without parole for juveniles under 18 at the time of their crimes violates the eighth amendment's prohibition against cruel and unusual punishments. On the heels of that, our supreme court has held that *Miller* and its progeny apply to defendants who committed offenses as juveniles and were sentenced to life, whether mandatory or discretionary, natural or *de facto*, and whose sentencing court failed to consider their youth and its attendant characteristics when imposing the sentence. *People v. Buffer*, 2019 IL 122327, ¶ 27. Notably, our supreme court has also held that a prison sentence of over 40 years imposed on a juvenile offender constitutes a *de facto* life sentence in violation of the eighth amendment. *Id.* ¶ 41.

¶ 27 Defendant readily acknowledges that he was over age 18 at the time of his offense but nonetheless contends that *Miller* should extend to him since he was still a youthful 19-year-old when he murdered Zymali. Although not a juvenile, he maintains his 55-year sentence was a *de facto* life sentence and that the trial court imposed it without considering in mitigation his

youth as it related to his culpability or rehabilitation. Thus, defendant claims his sentence violated the eighth amendment under *Miller*.

¶ 28    By now, it is clear that the categorical findings made by *Miller* and its progeny under the federal eighth amendment apply only to juveniles. See *People v. Harris*, 2018 IL 121932, ¶¶ 49-61 (rejecting a facial challenge under the federal eighth amendment to a life sentence for an offender over 18 years old but under 21 years old and conclusively noting, "the age of 18 marks the present line between juveniles and adults"); *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 37; *People v. Handy*, 2019 IL App (1st) 170213, ¶ 37. Since defendant was age 19 at the time of his crime, he cannot avail himself of the eighth amendment.

¶ 29    Defendant further maintains that his sentence violates the proportionate penalties clause of the Illinois Constitution, which provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. A sentence violates the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). Defendant now seeks to extend the reasoning in *Miller* to young adults such as himself under our state proportionate penalties clause. We reject defendant's arguments for several reasons.

¶ 30    First and foremost, we find defendant's 55-year sentence for residential burglary and a senseless murder, which he committed as the principal at the legal age of adulthood, does not shock the moral sense of the community and thus is not cruel or degrading. *Cf. People v. House*, 2019 IL App (1st) 110580-B, ¶ 32, *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020) (finding the 19-year-old defendant's mandatory life sentence for murder via accountability, where he acted

only as a lookout and had no criminal background, shocked the moral conscience of the community and therefore violated the proportionate penalties clause). Rather, defendant's sentence adequately represents his personal culpability. *House*, 2019 IL App (1st) 110580-B, ¶ 46.

¶ 31    In *Handy*, 2019 IL App (1st) 170213, also on appeal from the denial of leave to file a successive postconviction petition, this court recently observed that "whether a defendant physically committed the offense is a significant consideration for courts tasked with deciding whether to extend *Miller* principles to a young adult under the proportionate penalties clause." *Id.* ¶ 40. *Handy* declined to extend *Miller* under the proportionate penalties clause, where the defendant, at age 18½, actively participated in invading the victims' home, holding a gun to the head of one victim while his codefendants robbed and attacked the family, kidnapping their 15-year-old daughter, and then actively participating in her gang rape. *Id. Handy* further found that, before imposing the defendant's 60-year real time sentencing term, the sentencing court was able to consider the defendant's presentence investigation report of his age, family background, and education. *Id.* ¶ 41. Accordingly, the court held the defendant could not establish the prejudice needed for leave to file his successive postconviction petition. See *id.* ¶ 42; see also *People v. McClurkin*, 2020 IL App (1st) 171274, ¶¶ 20-23 (reaching a holding consistent with *Handy*); *People v. Green*, 2020 IL App (5th) 170462, ¶¶ 37-43 (same).

¶ 32    That leads us to our second point. Here, even assuming defendant could establish that *Miller* principles extended to him, where he committed the murder at the still youthful age of 19, the record before us demonstrates that his sentencing hearing was *Miller*-compliant. See *Holman*, 2017 IL 120655, ¶ 37 (noting that, under *Miller*, the sentencing court must consider a juvenile's "age and age-related characteristics and the nature of their crimes" as "mitigating

circumstances"(internal quotation marks omitted)). *Miller* identifies characteristics of youth as including but not being limited to (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation. *Id.* ¶ 46. Furthermore, a key feature of the juvenile's sentencing hearing is that the defendant had the "opportunity to present evidence to show that his criminal conduct was the product of immaturity and not incorrigibility." *Id.* ¶ 49. Applying these factors reserved for juveniles to defendant, we cannot countenance his constitutional claim.

¶ 33    At sentencing in this case, the trial judge stated he had read the PSI several times. The PSI highlighted defendant's young age when he murdered the victim but did not depict him as immature, impetuous, or unable to appreciate risks and consequences. The PSI also highlighted defendant's problems with alcohol and his traumatic family history of abuse and further revealed that defendant was a recent immigrant to the United States, with pressure to earn money for his family. Although it revealed no criminal history in the United States, as the trial court noted, there was also no evidence taken from justice system in Mexico confirming or denying that defendant had a criminal history there. The trial evidence further revealed that defendant had admitted his involvement in the murder only after DNA evidence linked him to the crime. In spite of defendant's low-grade education, there was nothing presented at trial or at sentencing to indicate that he was incompetent and could not communicate with police officers or prosecutors

or assist his own attorney. In addition, the trial court's comments suggested it believed defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation given that defendant denied responsibility for the murder even at trial and declined to address the murdered victim's family. See *id.* ¶ 46. In addition to the PSI, the trial court reviewed an "advocacy mitigation report," which the court found was "thorough" and "exhaustive." Defendant admits that report is not presently part of the record on appeal.

¶ 34    We note that it is defendant's burden as the appellant to provide a sufficiently complete record on appeal so that this court can be fully informed about the issues, and absent a complete record, it is presumed the trial court's judgment conforms to the law and has a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984); *People v. Hinton*, 249 Ill. App. 3d 713, 718 (1993). In other words, any doubts arising from an incomplete record are resolved against the appellant. *Foutch*, 99 Ill. 2d at 392; *Hinton*, 249 Ill. App. 3d at 718. Given that we do not even have all the exhibits or reports considered at defendant's trial and sentencing hearing, especially the report prepared by defendant himself, we must resolve any doubts arising from the record against defendant and presume the trial court's sentencing judgment conformed to the law and had a sufficient factual basis. In light of that, we find that the trial court sufficiently addressed the *Miller* factors but found they did not warrant a lesser sentence given the seriousness of the offense. See *People v. Croft*, 2018 IL App (1st) 150043, ¶ 32. Given the record before us, the sentencing hearing passed constitutional muster, and defendant cannot show the necessary prejudice needed to advance his successive postconviction petition. In other words, he cannot demonstrate that his claim not raised in his initial postconviction so infected the trial that his resulting conviction or sentence violated due process. See *Evans*, 2013 IL 113471, ¶ 10.

¶ 35    Notwithstanding our holding, we observe that this court recently permitted two defendants who were convicted of violent murders that they committed at the ages of 18 and 19, respectively, to file successive postconviction petitions challenging their discretionary sentences of 40 years and life imprisonment because the sentences violated our state constitution's proportionate penalties clause in light of *Miller* and thus they established prejudice. See *People v. Ruiz*, 2020 IL App (1st) 163145; *People v. Johnson*, 2020 IL App (1st) 171362. In doing, so *Ruiz* and *Johnson* expressly rejected *Handy*, on which we have relied. However, we find both *Handy* and the dissents in *Ruiz* and *Johnson* more persuasive. For example, the dissent in both cases noted that *Miller* did not apply to those particular defendants (and specifically observed that *Ruiz* did not even receive a *de facto* life sentence); even if it did, the sentencing courts adequately considered the defendants' youth and its attendant characteristics in reaching their sentencing decisions, thus precluding any constitutional violation and making the sentences *Miller*-compliant. As set forth, we abide by similar reasoning here even on the limited record.

¶ 36    We also find our recent case, *Minniefield*, 2020 IL App (1st) 170541, distinguishable. In *Minniefield*, this court likewise permitted the defendant's successive postconviction petition to advance on a proportionate penalties violation. *Id.* ¶¶ 38, 49. There, the defendant was age 19 with no violent criminal history, gang affiliation, or family/work problems, and there were no psychological reports at sentencing or findings of incorrigibility, yet he was sentenced to a *de facto* life term of 50 years' imprisonment. *Id.* ¶ 2. As set forth, we have a limited sentencing record, and the record actually before us betrays that the hearing was *Miller*-compliant. Moreover, the defendant in *Minniefield* demonstrated he was entitled to a new hearing to prove that *Miller* even applied because he attached both scholarly and news articles on young adults and numerous certificates of completion for courses in subjects such as parenting, employment

skills, family finance, and anger management. Here, defendant did not attach any such documents in support of his petition.

¶ 37   We therefore also reject defendant's argument that *Harris* dictates that his successive petition must advance. *Harris*, 2018 IL 121932, ¶¶ 45-48. *Harris* was a direct appeal case wherein the supreme court held that the record was insufficiently developed to address the defendant's contention that *Miller* applied in the context of his proportionate penalties claim. The defendant, who was 18 when he committed his crime, argued his 76-year sentence shocked the moral sense of the community given the facts of his case, his youth, and other mitigating circumstances. The supreme court declined to consider the as-applied challenge, noting that there was no evidentiary hearing or factual development to support it in the trial court. However, *Harris* noted that the defendant was not foreclosed from later raising the claim and that it "could *** potentially be raised" in a postconviction petition. *Id.* ¶ 48.

¶ 38   *Harris* nonetheless made no mention of exactly what is necessary to overcome the high bar for leave to file a successive postconviction petition, and we find defendant's flat allegation as to evolving science on juvenile maturity and brain development is simply insufficient. See *People v. Tidwell*, 236 Ill. 2d 150, 161 (2010) (a defendant seeking leave to institute a successive postconviction "must submit enough in the way of documentation to allow a circuit court to make that determination"). Here, other than generally asserting studies show that sometimes youthfulness can extend into a person's late teens and early twenties, defendant does not now allege how he was particularly affected by any immaturity or special circumstances that would provide a compelling reason to advance his successive postconviction petition. See *Smith*, 2014 IL 115946, ¶ 35. He has not raised any facts on appeal or in his petition that were not already included in the record, presented at his sentencing hearing, and considered by the trial court.

Defendant has not cited any legal authority to support a finding that his sentence imposed on him at 19, based on direct participation in the crime of first degree murder and imposed after the presentation of a PSI and other mitigating evidence, could be found to violate the proportionate penalties clause.

¶ 39    Based on the foregoing, we hold that defendant did not establish prejudice for leave to file his successive postconviction petition because he was an adult at the time he committed and acted as the principal in committing the offenses of residential burglary and murder. Also, the limited record of the sentencing hearing shows the trial court considered relevant factors concerning defendant's youth and its attendant characteristics before imposing his sentence.

¶ 40                                    CONCLUSION

¶ 41    We affirm the judgment of the circuit court in denying defendant leave to file his successive postconviction petition.

¶ 42    Affirmed.

---

**No. 1-17-1001**

---

| | |
|---|---|
| **Cite as:** | *People v. Carrion*, 2020 IL App (1st) 171001 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 02-CR-2831; the Hon. James N. Karahalios, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and S. Emily Hartman, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Brian K. Hodes, and Miles J. Keleher, Assistant State's Attorneys, of counsel), for the People. |

---